In re AETNA INDUSTRIES, INC., Debtor.

In re Zenith Industrial Corporation, Debtor.

AZ Automotive Corp., Plaintiff,

v.

Atzen Industries, Inc., f/k/a Aetna Industries, Inc. and Trianon Industries Corp., and Zenat Corporation f/k/a Zenith Industrial Corporation, Defendants.

Bankruptcy Nos. 02–10418, 02–10754. Adversary No. 03–54772.

United States Bankruptcy Court, D. Delaware.

April 12, 2006.

Michael R. Lastowski, Duane Morris LLP, Wilmington, DE, J. Kevin Cogan, Holly H. Saigo, Jones Day, Columbus, OH, for Plaintiff AZ Automotive Corp.

Mark Minuti, Jeremy W. Ryan, Saul Ewing LLP, Wilmington, DE, Thomas J. Tallerico, J. Adam Behrendt, Bodman LLP, Troy, MI, for Defendants/Counter Plaintiffs.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

This opinion is with respect to the parties' cross-motions for summary judgment. The plaintiff AZ Automotive Corporation's ("AZ") motion (Adv.Doc. # 92) seeks partial summary judgment on Counts I and IV of its adversary complaint against the defendants Atzen Industries, Inc. ("Aetna"), Trianon Industries Corporation ("Trianon"), and Zenat Corporation ("Zenith"). The defendants contest that motion and have filed their own motion (Adv. Doc. # 95) seeking partial summary judgment on their counterclaim against AZ. The defendants also request that, if they prevail on their motion, the Court certify the judgment as final under Fed.R.Civ.P. 54(b). For the reasons stated below, the Court will deny AZ's motion for partial summary judgment but will grant the defendants' motion. However, the Court will deny the defendants' request that the judgment be certified as final.

## BACKGROUND

Before petitioning for bankruptcy in February and March 2002, Aetna and Zenith were engaged in the automotive stamping and other metal-formed products business. Trianon was the parent corporation of both Aetna and Zenith. On March 8, 2002, Aetna, Zenith and Trianon entered into an Asset Purchase Agreement ("APA") with Questor Management Company ("Questor"), through its wholly owned subsidiary AZ, whereby AZ agreed to purchase the assets of Aetna and Zenith. This Court approved that transaction by order dated May 22, 2002, the transaction closed on June 17, 2002, and on July 28, 2003 AZ filed its complaint.

*The Plaintiff's Motion For Partial Summary Judgment*

In the transaction, Aetna and Zenith promised to reimburse AZ for certain environmental cleanup costs associated with the purchased real property. Aetna and Zenith also promised that there were no threatened material changes in their customer relationships. AZ alleges that Aetna and Zenith breached both promises. Further, AZ believes that no genuine issue of material fact is in dispute and has, thus, moved for summary judgment.

*The Defendants' Motion For Partial Summary Judgment*

In the sale, Aetna and Zenith transferred their assets to AZ for roughly $135 million. However, due to some accounting errors, AZ owes the defendants an additional $819,823 as a purchase price adjustment. With respect to this adjustment, the defendants claim that there are no genuine issues of material fact in dispute and have, accordingly, moved for summary

judgment on their counterclaim. In the event the Court grants that motion, the defendants ask that the judgment be certified as final under Rule 54(b).

■ AZ acknowledges that the parties agreed to the $819,823 price adjustment. However, AZ asserts that the motion for partial summary judgment should be denied because of its outstanding claims against the defendants. According to AZ, these claims may be used as offsets against the $819,823 price adjustment either by way of set-off[1] or recoupment.

## DISCUSSION

Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P 56(c).[2] When deciding a motion for summary judgment, the court views the facts, and all permissible inferences from those facts, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Where the record could lead a reasonable trier of fact to find for the non-moving party, disposition by summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

This discussion has two parts. Part I addresses AZ's motion for partial summary judgment on Counts I and IV of its adversary complaint. Part II addresses

---

**1.** Admittedly, none of the claims have been liquidated (Adv.Doc. # 102, pp. 2, 19). As such, any right to set-off that AZ may have has not yet ripened.

**2.** Federal Rule of Civil Procedure 56(c) is applicable to matters in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7056.

the defendants' motion for partial summary judgment on their counterclaim.

## Part I: The Plaintiff's Motion

The plaintiff seeks summary judgment with respect to Counts I and IV of the complaint. Count I alleges a breach of contract due to the defendants' failure to indemnify the plaintiff for environmental cleanup costs. Count IV charges the defendants with failing to inform (or misinforming) the plaintiff with respect to a material change in a customer relationship. Michigan law governs both counts. (Adv. Doc. # 1, Ex. A–2, § 12.2(a)).

*Count I*

 As with any contract dispute, an examination must begin with the contract itself. *Singer v. Am. States Ins.*, 245 Mich.App. 370, 631 N.W.2d 34, 41 n. 8 (2001). Section 10.1 of the APA states that each defendant "agrees to indemnify, defend, and hold harmless Buyer ... against any and all liabilities, damage and losses ... actually incurred by Buyer ... based upon ... any Retained Liabilities." (Adv.Doc. # 1, Ex. A–2, § 10.1). Under § 2.10(k) of the APA, "Retained Liabilities" include an "Environmental Condition." (Adv.Doc. # 1, Ex. A, § 2.10(k)). The APA defines Environmental Condition broadly to include, among other things, a hazardous substance situation that violates the applicable environmental laws. (Adv. Doc. # 1, Ex. A, p. 5). To qualify as an Environmental Condition, however, the condition must exist at or before the June 17, 2002 closing date. (Adv. Doc. # 1, Ex. A, p. 5 and § 2.10(k)). The parties contemplated the existence of at least some such conditions; so, at the closing, AZ received a $295,000 credit against the purchase price for anticipated cleanup expenses. (Adv.Doc. # 1, ¶ 17).

As such, Aetna and Zenith must indemnify AZ if (1) AZ "actually incurred" losses, (2) from environmental conditions existing at or before the closing date, (3) that exceeded the initial $295,000 credit. On the other hand, if the losses have not yet been incurred, if they are less than the initial credit, or if they arose from a condition not present as of the closing date, then AZ will not be able to recover. Because these facts are in dispute, the Court cannot grant summary judgment on Count I.

Under the plain terms of the contract, AZ is only entitled to indemnity for damage or losses "actually incurred." (Adv. Doc. # 1, Ex. A–2, § 10.1). This language is consistent with BLACK's LAW DICTIONARY's definition of indemnify, namely, "to reimburse (another) for a loss suffered." *Accord* Merriam–Webster's Collegiate Dictionary 591 (10th ed.1993)("to make compensation to for incurred hurt, loss, or damage.").

From AZ's submissions, however, it is quite difficult to discern which damages AZ has actually incurred, if any, and which damages AZ predicts it will incur. For example, according to Paragraph 17 of AZ's complaint, "[t]he actual losses, and the costs associated to remediate the environmental conditions ... *will likely* total $751,300." (Adv.Doc. # 1, ¶ 17)(emphasis added). Minus the credit, "AZ has suffered *or will suffer* a loss of $456,300 relating to remediating the environmental conditions ...." (Adv.Doc. # 1, ¶ 17)(emphasis added). Thus, it is not at all clear if AZ "has suffered" any damages or if all of the claimed damages are for items that AZ anticipates it "will suffer."

Similarly, the Court cannot locate in any of AZ's papers an admissible undisputed itemization of actually incurred costs. Instead, AZ simply maintains that it is entitled to damages, whatever they may be. In AZ's words, "[t]he Motion's focus is on the Defendants' liability, leaving for anoth-

er day the issue of damages." (Adv.Doc. # 113, p. 1). AZ, however, must still provide admissible undisputed evidence that it has suffered some damage; this, it has failed to do.

AZ has attached an expert report that identifies the cost for certain environmental remediation items:

1) $111,932 for costs incurred by AZ with respect to Plant 4,

2) $195,385 for costs incurred by AZ with respect to Plant 6,

3) $250,000 for anticipated costs associated with Plant 4,

4) $450,000 for anticipated costs associated with Plant 6, and

5) $30,000 for anticipated costs to conduct additional evaluations.

(Adv.Doc. # 94, pp. A–67, A–68). On its face, the report makes clear that items # 3, # 4, and # 5 are anticipated and have not yet been "actually incurred." Thus, the best case scenario for AZ is that it incurred $307,317 [3] less the $295,000 credit, which would result in a total of actually incurred costs of $12,317.

■ However, such figures cannot be accepted for several reasons. For starters, with respect to the items that the expert report identifies as already spent, the report is hearsay and the defendants do not acknowledge its validity with respect to those items. In addition, other documents have conflicting figures. For example, there is a mystery document (also probably hearsay and not accepted by the defendants) attached as part of Exhibit 9. (Adv. Doc. # 106, Ex. 9, AZ 01185–01187). The document appears to have come from AZ's files reflecting the amounts purportedly spent for environmental matters. The amounts contained

in that document differ from the amounts set forth in the expert report:

1) $120,712 for costs incurred by AZ with respect to Plant 4,

2) $70,813 for costs incurred by AZ with respect to Plant 6,

3) $257,918 for anticipated costs associated with Plant 4, and

4) $510,687 for anticipated costs associated with Plant 6.

(Adv. Doc. # 106, Ex. 9, AZ 01185–01187). Like the expert report, items # 3 and # 4 are anticipated and, therefore, cannot be reimbursed. Unlike the expert's report, the sum of the actually incurred costs are less than the credit already paid.[4] Accordingly, if the figures identified in Exhibit 9 were accepted as true, then the movant would not be entitled to any damages at this time.

AZ does not specify which set of figures it currently endorses. Rather, AZ "merely seeks a determination that Defendants are liable for the remediation costs …," (Adv.Doc. # 113, p. 16), and asserts that the defendants "refuse to indemnify AZ Auto for those remediation costs." (Adv. Doc. # 93, p. 24). Given that AZ has failed to provide uncontested evidence that it has suffered at least some loss, the Court cannot grant its motion for summary judgment. (Adv.Doc. # 113, p. 1).

Also, under the express terms of the APA, the defendants are only liable for Environmental Conditions existing at the date of closing. (Adv.Doc. # 1, Ex. A, § 2.10(k)). With respect to one of the properties, the defendants correctly state that they are not responsible for the remediation of any hazardous substance-in this case, free phase-oil-that was not present before the closing date. (Adv.Doc. # 105, p. 31). AZ seeks to minimize the

---

**3.** Item # 1 ($111,932) plus Item # 2 ($195,-385).

**4.** Item # 1 ($120,712) plus Item # 2 ($70,813) equals $191,525, which is less than $295,000.

import of the release of new oil by claiming that "any such release is *d[e] minim[i]s* when compared to the volume of old oil . . . ." (Adv.Doc. # 113, p. 10)(emphasis in original). AZ offers no evidence to support its claim that the impact of the new oil is *de minimis* other than to say that there was only a period of *two years* for new oil to accumulate. (Adv.Doc. # 113, p. 10). This unsupported claim cannot prevail on a motion for summary judgment. Thus, there is a genuine issue of fact with respect to what, if any, of the free phase oil the defendants are responsible for.

AZ correctly points out that under Rule 56 "summary judgment . . . may be rendered on the issue of liability alone although there is a genuine issue as to the *amount* of damages." FED. R. CIV. P. 56(c) (emphasis added). In this case, not only is there a genuine issue as to the amount of damages, but there is a genuine issue as to whether *any* damages were actually incurred. In such circumstances, summary disposition is inappropriate.

In other words, AZ seeks a determination of the defendants' liability for actually incurred losses. The question of whether AZ has incurred any such losses is separate and distinct from the quantum of those losses. The extent of loss can be separated from the question of liability-whether AZ incurred any loss cannot.

Thus, AZ obviously has indemnification rights and if, and when, it can prove that it spent specified sums for environmental remediation and those sums were incurred in remediating pre-closing environmental problems, then AZ will be entitled to a money judgment. The pleadings and the documents referred to by AZ do not support that judgment at this time, however.

*Count IV*

Count IV alleges that the defendants failed to disclose a material customer's threat to terminate its contract with Aet-

na. If true, this would be a breach of the parties' agreement. However, because several material issues of fact are disputed, the Court cannot grant summary judgment.

For some time, Aetna served as a Tier II supplier for a customer named TI Automotive ("TI"). (Adv.Doc. # 94, Appx. A–33, p. 228:18). In early 2002, TI invited all of its current and prospective suppliers to a stamping commodity supplier conference. (Adv.Doc. # 94, Appx. A–108, p. 18:9–16). The conference took place on March 6, 2002 with a representative of Aetna in attendance. (Adv.Doc. # 94, Appx. A–109, p. 19:3–19). At the conference, TI presented a strategic sourcing initiative. (Adv.Doc. # 94, Appx. A–140).

The goals of the initiative were to achieve substantial cost reductions and consolidate TI's supplier base. (Adv.Doc. # 94, Appx. A–140). In other words, TI felt it could optimize its supply base by awarding a greater percentage of its business to a fewer number of suppliers. Accordingly, TI instructed the suppliers to submit a product price quote via email by April 8, 2002. (Adv.Doc. # 94, Appx. A–142).

Sometime after the meeting, Aetna employees reviewed the conference materials. (Adv.Doc. # 94, Appx. A–114, pp. 27:23–24). Mr. Thal, Aetna's Vice President of Engineering, and Ms. Morrow, Aetna's CFO, viewed TI's sourcing initiative as a routine automotive industry exercise that presented an opportunity to gain additional business. (Adv.Doc. # 106, Ex. 1, p. 32:6–8). Nevertheless, Ms. Morrow wanted to be cautious and informed AZ's due diligence coordinator, Mr. Carroll, of the sourcing initiative. (Adv.Doc. # 106, Ex. 1, pp. 44:23–45:1).

In April 2002, Aetna submitted a bid to TI as instructed. (Adv.Doc. # 106, Ex. 10,

p. 39:9–13). TI received the bid but advised Aetna that it was not the best offer and suggested that Aetna submit another bid. (Adv.Doc. # 94, Appx. A–150). Aetna followed this suggestion and prepared a revised quotation, which it submitted to TI by the April 26, 2002 deadline. (Adv.Doc. # 93, p. 10). After receiving the revised bid, however, TI was still dissatisfied and invited Aetna to meet "to discuss both . . . the commercial and technical aspects of your quotation response." (Adv.Doc. # 106, Ex. 9, AZ00951). The meeting took place on June 6, 2002. (Adv. Doc. # 1, ¶ 44–45; Adv. Doc. # 106, Ex. 9, AZ00951). Thereafter on June 10, 2002, Aetna again revised its bid. (Adv.Doc. # 106, Ex. 9, AZ00812). Then, on June 17, 2002, the sale transaction between Aetna and AZ closed. (Adv.Doc. # 1, ¶ 12). Five months later, on November 21, 2002, TI cancelled its contract with Aetna. (Adv.Doc. # 94, Appx. A–50).

 Unhappy with the post-closing loss of TI's business, AZ now complains that the defendants breached the terms of the APA. Under § 3.20(a) of the APA, the defendants represented that "no current material customer . . . has threatened or notified Sellers of its intent to terminate or materially . . . alter the terms of its business relationship . . . ." (Adv.Doc. # 1, Ex. A, § 3.20(a)). Section 8.1 requires that all representations, including those contained in § 3.20(a), be true and correct as of the closing date. (Adv.Doc. # 1, Ex. A, § 8.1). Thus, the issue is whether the defendants' § 3.20(a) representations were true and correct as of the closing.

AZ claims that the representations were false because, prior to the execution of the APA, TI threatened to terminate its relationship with Aetna. The defendants disagree for two reasons. First, TI's actions were not a "threat" or "notification" to terminate a material contract as contem-plated by § 3.20(a); rather, the notification of termination did not take place until November 22, long after the sale transaction closed on June 17, 2002. Second, even if TI's actions could be construed as a threat, TI was not a material customer.

With respect to the first point, there is ample support for the proposition that TI's sourcing initiative was not a threat or notification of intent to terminate a material contract. Specifically, the deposition testimony of several witnesses demonstrates that no one perceived the TI sourcing initiative and bidding process as a threat. Ms. Morrow, for example, testified that Aetna looked upon the sourcing initiative "as an opportunity for the company to gain new business with TI . . . ." (Adv.Doc. # 106, Ex. 1, pp. 31:23–32:2). She acknowledged that Aetna knew that it "might lose some parts and gain others" but expected that "overall it should be an opportunity for the company." (Adv.Doc. # 106, Ex. 1, 32:6–8). Likewise, Mr. Thal, Aetna's former Vice President of Engineering (now an AZ employee), "felt there was a very strong opportunity for us to gain business" from TI's initiative. (Adv. Doc. # 106, Ex. 10, p. 121:23–24). According to Mr. Thal, this type of sourcing initiative "was not uncommon in this business." (Adv.Doc. # 106, Ex. 10, p. 122:6–9). In addition, Mr. McMahon, the Aetna sales representative who attended the TI conference, stated that there was "no way I could have predicted that we would lose the business. I don't think anybody could have." (Adv.Doc. # 106, Ex. 8, p. 33:16–18).

On a motion for summary judgment, such evidence cannot simply be ignored. Thus, the defendants have put forth admissible evidence that TI's sourcing initiative was not a threat as contemplated by the APA.

However, even if the Court construed the sourcing initiative as a threat, the defendants disclosed it. (Adv.Doc. # 106, Ex. 1, pp. 44:23–45:1). AZ repeatedly asserts that Aetna's failure to disclose constituted a breach of the APA. But the only evidence before this Court, for purposes of summary judgment, is that the defendants *did* disclose TI's sourcing initiative to AZ prior to the closing. (*See* Adv. Doc. # 93, p. 12 n. 5). Again, the Court cannot simply disregard such evidence.

Moreover, even if TI threatened to terminate its business, and even if Aetna failed to disclose the threat to AZ, this still would not entitle AZ to summary judgment. Rather, under the APA, the defendants were only required to disclose the threats of "current material customers."

Aetna had just seven customers: General Motors Corporation, DaimlerChrysler Corporation, Ford Motor Company, Mitsubishi Motors, Inc., CAMI Automotive, Inc., TI and Dynamig. (Adv.Doc. # 106, Ex. 6, p. 56:11–23). The clear implication of the APA is that not all seven were material. If not all seven were material, then certainly a reasonable trier of fact could find that TI was not material because TI made up only a small percentage of Aetna's business: one percent of total gross profits and two percent of Aetna's projected EBITDA. (Adv. Doc. # 106, Ex. 7, QST 0578–QST 0616; Adv. Doc. # 106, Ex. 15, ¶ 7).

Further, the deposition testimony of several witnesses indicates that seemingly no one considered TI a material customer. Even Mr. Carroll, AZ's due diligence coordinator, admitted that "TI was a relatively small customer." (Adv.Doc. # 106, Ex. 6, p. 147:13–14). Mr. Thal, likewise, acknowledged that TI's sourcing initiative was not a "high priority project." (Adv. Doc. # 106, Ex. 10, p. 48:22–25). Simply put, TI's sourcing initiative "was not of importance." (Adv.Doc. # 106, Ex. 16, p. 41:1–9). In fact, according to Aetna's former president, the TI business was "not a big deal" and was so small that the person handling the TI sourcing initiative "was not even an Aetna employee .... He was a contract employee." (Adv.Doc. # 106, Ex. 16, p. 49:13–21).

The remarks of Mr. Bernander, AZ's president, further suggest the relative unimportance of TI. For example, after the closing, Mr. Bernander sent a letter to Questor's investors. The letter indicated that he had met with "key purchasing managers at each of [AZ's] customers within the first month of our ownership." But Mr. Bernander had not met with TI. (Adv. Doc. # 106, Ex. 7, QST 3881–QST 3885). "Why? Because [Tier 1 customers, which TI was not] made up 99% of our business." (Adv.Doc. # 106, Ex. 17, pp. 152:17–153:12). Further, in his report to investors, Mr. Bernander made no reference to the termination of the TI contract. Instead, Mr. Bernander observed that after nine months of operations following the closing, the company was "off to an excellent start, achieving our financial goals ...." (Adv. Doc. # 106, Ex. 7, QST 3881). Mr. Rueckel, a principal of Questor and officer of AZ, had a similar viewpoint. In explaining why the Questor investors were not informed of the TI event, Mr. Rueckel stated, "[w]e pick out the [problems] that are of the most significance and we talk about them." (Adv.Doc. # 106, Ex. 2, p. 134:11–20).

Thus, the above referenced comments show that: (1) the TI sourcing initiative was not "a high priority project" and "TI was a relatively small customer," that made up 1% of Aetna's business; (2) the TI contract "was not a big deal" and losing the business did not alter the "excellent start" that AZ had after acquiring Aetna; and (3) the loss of TI's contract was so

insignificant that it was not even mentioned to Questor's investors. On this record, a reasonable trier of fact could conclude that TI was not a material customer.

■ AZ fights this result and argues that TI was a material customer as a matter of law. To support this, AZ suggests that the APA's definition of a "Material Adverse Effect" should be applied to § 3.20(a). (Adv.Doc. # 93, p. 20). The Court disagrees.

AZ points to Article VIII of the APA, which contains conditions to the buyer's obligation to close. (Adv.Doc. # 93, p. 20). Among those conditions is § 8.5. That section states that "[n]o Material Adverse Effect with respect to either Seller shall have occurred between the date of this Agreement and on or prior to the Closing Date." (Adv.Doc. # 1, Ex. A–2, § 8.5). AZ then looks to the definition of Material Adverse Effect, which includes, among other things: (1) the termination of a "Key Contract" and (2) the occurrence of a "Platform Event." (Adv.Doc. # 1, Ex. A, p. 8).

Key Contracts are those contracts listed in Schedule 8.4 of the APA. (Adv.Doc. # 1, Ex. A, p. 8). That schedule refers to "[a]ny and all Contracts relating to any Platform." (Sch.8.4, p. 1.¶ 7). Platform means the platforms listed in Schedule 1(g). (Adv.Doc. # 1, Ex. A, p. 10). Schedule 1(g) includes the TI contract. (Sch.1(g), p. 1). AZ sees this as significant. The Court does not share this view. To the extent that the TI contract was a Key Contract, it clearly was not terminated until November 2002, well after the closing.

Likewise, AZ traces the meaning of a Platform Event. The APA defines a Platform Event in terms of "an aggregate price change by any one or more customers" having a specified effect on Aetna's profit margin. (Adv.Doc. # 1, Ex. A, p.

10). Again, this definition is inapplicable. AZ is not proceeding under § 8.5 because the TI contract was not terminated until after the closing. Thus, the terms Material Adverse Effect, Platform Event, and Key Contract are not applicable. These terms only refer to pre-closing losses (of either profits or contracts).

Put differently, the term Material Adverse Effect is relevant if a customer actually terminates certain contracts or if a change in a contract price actually effects Aetna's profit margins in a specified way. Here, AZ proceeds under § 3.20(a), not § 8.5. (Adv.Doc. # 1, 93, p. 3). Section 3.20(a) deals with threats of loss, rather than actual loss. Thus, the Court cannot treat § 8.5 and § 3.20(a) as identical where the two sections have different purposes and contain completely different terms.

The provisions each make specific representations. The absence of the use of the defined term Material Adverse Effect in § 3.20(a) suggests that the term not be applied to that section. To read that term into § 3.20(a) in place of the word "material" or "material customer," as AZ suggests, would render much of § 3.20(a) meaningless.

To be clear, AZ concedes that the APA does not define the term "material." (Adv. Doc. # 113, p. 6). AZ also concedes that the term "material" and Material Adverse Effect are different. (Adv.Doc. # 113, pp. 6–7). Nonetheless, AZ argues that the Court should read the defined term Material Adverse Effect into § 3.20(a). The Court declines this invitation. If the parties wanted the term Material Adverse Effect in § 3.20(a), they could have put it there.

**Part II: The Defendants' Motion**

The defendants seek summary judgment with respect to their counterclaim. AZ insists that its potentially offsetting claims

require this Court to deny the defendants' motion. Both parties' briefs go into significant detail regarding the validity of AZ's right to offset. However, those details need not be addressed at this stage. Rather, there are only two questions that need answering here: 1) whether a dispute exists with respect to the $819,823 price adjustment and 2) if no dispute exists, whether the judgment against AZ should be certified as final pursuant to Rule 54(b).

### 1. No Genuine Issue Of Material Fact Exists With Respect To The Price Adjustment

■ Federal Rule 56 authorizes a court to enter summary judgment on either a claim or counterclaim and indeed directs that the "judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

According to AZ's brief, "AZ Auto does not dispute that the parties agreed to the Price Adjustment ...." (Adv. Doc. # 102, p. 2). Nevertheless, AZ believes that summary judgment is inappropriate. In AZ's words, "[b]ecause AZ Auto has asserted a right to offset the Price Adjustment against Defendants' obligations, summary judgment on Defendants' counterclaim is premature." (Adv.Doc. # 102, p. 15). The Court disagrees.

Although AZ's claims arise from the same transaction as the defendants' $819,823 counterclaim, the actions can be separated. In other words, AZ's and the defendants' claims are not so factually intertwined that granting partial summary judgment for the defendants would interfere with AZ's claims. See Greenblatt v.

*Prescription Plan Servs. Corp.,* 783 F.Supp. 814, 823 (S.D.N.Y.1992)("Although plaintiffs' claim and defendants' counterclaim may be said to relate to the ... [same] [c]ontract, the counterclaim is separate and distinct from plaintiffs' claim ..., having no identity of elements of proof.")

Therefore, in this Court's view, the possibility of an offset does not create a factual dispute. See *Electro–Catheter Corp. v. Surgical Specialties Instrument Co.,* 587 F.Supp. 1446, 1457 (D.N.J.1984)("In similar circumstances, other courts have granted partial summary judgment on contract claims, even though the defendant could be entitled to a setoff or recoupment if it were successful on its counterclaim.").

Courts in this circuit have consistently held to this position. Along the way, there has been dispute regarding the proper standard for certification under Rule 54(b), but there has been little debate with respect to the propriety of granting partial summary judgment in the face of a possible offset. The following are just a few examples.

In *Curtis Publ'g Co. v. Church, Rickards & Co.,* 58 F.R.D. 594 (E.D.Pa.1973), the defendants argued that their counterclaims should be viewed as defenses and that these defenses should prohibit the entry of partial summary judgment against them. *Id.* at 597. In rejecting this position, the court noted that a compulsory counterclaim, which is separable from the plaintiff's claim, cannot preclude a grant of summary judgment. *Id.* at 598.

Likewise, in *Allis–Chalmers Corp. v. Philadelphia Elec. Co.,* 64 F.R.D. 135 (E.D.Pa.1974) *appeal dismissed by* 521 F.2d 360 (3d Cir.1975), the court granted a motion for partial summary judgment in the face of a possible offset. *Id.* at 139–40. There, the court reasoned that "[s]ince defendant's counterclaim does state a sep-

arate and independent cause of action, and since it presents no issues of fact which may prove important to plaintiff's claim, the entry of summary judgment on plaintiff's claim is not only proper but is required under Federal Rule 56." *Id.* at 140.

In *Berel Co. v. Sencit F/G McKinley Assocs.*, 710 F.Supp. 530 (D.N.J.1989), the District Court for the District of New Jersey came to the same result. In that case, the court held that "regardless of whether potential counterclaims or set-offs are outstanding, summary judgment is still proper." *Id.* at 549.

Later, in *Edelen & Boyer Co. v. Kawasaki Loaders, Inc.*, No. 92–1990, 1993 WL 4177, 1993 U.S. Dist. LEXIS 115 (E.D.Pa. Jan. 6, 1993), the court reached the same conclusion. In that case, the defendant submitted that it was entitled to summary judgment on its counterclaim. *Id.* at *2, 1993 U.S. Dist. LEXIS 115 at *5. The plaintiff admitted liability but asserted summary judgment was inappropriate due to its five pending claims. *Id.* The plaintiff argued that all the issues ought to be resolved together and that summary judgment must be denied. *Id.* Further, the plaintiff contended that it had a valid right of set-off and that, in any event, its pending claims may be offset against the defendant's claim. The court disagreed and granted summary judgment in favor of the defendant. *Id.*

More recently, in *Checkers Drive–In–Restaurants, Inc. v. Laster*, No. 02–252, 2003 WL 22133836, 2003 U.S. Dist. LEXIS 18114 (E.D.Pa. Sept. 16, 2003), the plaintiff sought summary judgment on its claims; the defendants did not dispute the claims but argued that summary judgment was "premature in light of the possibility that any damages may be set off. . . ." *Id.* at *3, 2003 U.S. Dist. LEXIS 18114 at *8. Again, the court rejected this argument. *Id.*

What is clear from these authorities is that AZ's "assertions of its entitlement to an offset do[ ] not preclude this court from granting partial summary judgment . . . since no material facts remain for adjudication." *Electro–Catheter*, 587 F.Supp. at 1456–57; *see Continental Can Co., Inc. v. Michael C. Birnkrant Interests, Inc.*, No. 89C2682, 1990 WL 140989, at *3, 1990 U.S. Dist. LEXIS 12764, at *7 (N.D.Ill. Sept. 26, 1990)("[W]here undisputed material facts establish the defendant's liability and the only facts in dispute involve the amount of damages due the plaintiff because the plaintiff's prayer may be subject to set-off, summary judgment is appropriate."); *Chemetron Corp. v. Cervantes*, 92 F.R.D. 26, 30 (D.P.R.1981)("The fact that defendant's counterclaim is compulsory does not absolutely preclude the entry of partial summary judgment, nor does the fact that the amount of [the defendant's] counterclaim might exceed [the plaintiff's] claim."); *see, e.g., Omark Indus., Inc. v. Lubanko Tool Co.*, 266 F.2d 540, 541 (2d Cir.1959)(affirming a grant of partial summary judgment); *Kurz–Kasch, Inc. v. Holtzberg*, No. 05–519, 2006 WL 561918, at *3, 2006 U.S. Dist. LEXIS 8834, at *9 (D.N.J. Mar. 7, 2006)(granting partial summary judgment).

■ Thus, "[t]he existence of other unadjudicated claims in the suit . . . does not affect the propriety of summary judgment in this case." *Schroeter v. Ralph Wilson Plastics, Inc.*, 49 F.R.D. 323, 326 (S.D.N.Y.1969). Rather, "[o]nce the independent nature of the claim is established, considerations of possible setoff through recovery on other claims by the party against whom summary judgment is taken become relevant only to the question of whether the summary judgment as rendered should be made final under Rule 54(b) prior to resolution of any remaining issues in the case." *Id.*

Since AZ does not dispute the agreed amount of the price adjustment, and since that obligation is clearly separable from AZ's claims, the motion for partial summary judgment will be granted.

### 2. The Court Will Not Certify The Judgment As Final Under Rule 54(b)

■ Having decided that partial summary judgment is appropriate, this Court must determine whether to certify the judgment as final under Rule 54(b). By its nature, a grant of partial summary judgment is interlocutory. FED. R. CIV. P. 54(b). Thus, such a judgment does not become final until the entry of final judgment of all the issues in the case, unless the trial court certifies the judgment as final under Rule 54(b). *Saber v. FinanceAmerica Credit Corp.*, 843 F.2d 697, 702 (3d Cir.1988).

■ To certify the judgment as final under Rule 54(b), the court must make certain determinations. *Id.* A court must "first determine that it is dealing with a 'final judgment.' It must be a 'judgment' in the sense that it is a decision upon a cognizable claim for relief, and it must be 'final' in the sense that it is 'an ultimate disposition of an individual claim entered in the course of a multiple claims action.'" *Curtiss–Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980)(*quoting Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 436, 76 S.Ct. 895, 100 L.Ed. 1297 (1956)).

■ Second, after making a finding of finality, "the court must make an express determination that there is no just reason for delay." *Curtiss–Wright*, 446 U.S. at 3, 100 S.Ct. 1460. The Supreme Court has cautioned that "[n]ot all final judgments on individual claims should be immediately appealable, even if they are in some sense separable from the remaining unresolved claims." *Id.* at 8, 100 S.Ct. 1460. Beyond this, however, the Supreme Court has been "reluctant either to fix or sanction narrow guidelines for the district courts to follow." *Id.* at 11, 100 S.Ct. 1460.

There are two reasons for the Supreme Court's reluctance to fix precise guidelines. First, the trial court is in a better position to weigh the equities or, in the Court's words, "the task of weighing and balancing the contending factors is peculiarly one for the trial judge, who can explore all the facets of a case." *Id.* at 12, 100 S.Ct. 1460. In this respect, the trial court is "the one most likely to be familiar with the case and with any justifiable reasons for delay." *Sears, Roebuck*, 351 U.S. at 437, 76 S.Ct. 895. Second, "the number of possible situations is large . . . ." *Curtiss–Wright*, 446 U.S. at 10, 100 S.Ct. 1460. Thus, a determination of certification necessarily escapes precise guidelines and "is, with good reason, vested by the rule primarily" in the trial court. *Id.*

■ In exercising this discretion, however, a court "must take into account judicial administrative interests as well as the equities involved." *Id.* at 8, 100 S.Ct. 1460. "Plainly, sound judicial administration does not require that Rule 54(b) requests be granted routinely." *Id.* at 10, 100 S.Ct. 1460. Rather, entry of judgment under Rule 54(b) is "the exception, not the rule . . . ." 10–54 JAMES WM. MOORE ET AL, MOORE'S FEDERAL PRACTICE—CIVIL § 54.23(3)(3d ed.2005); *see Gerardi v. Pelullo*, 16 F.3d 1363, 1372 (3d Cir.1994)("[A] district court should be conservative in invoking Rule 54(b) . . . ."); *Anthuis v. Colt Indus. Operating Corp.*, 971 F.2d 999, 1003 (3d Cir.1992)(characterizing Rule 54(b) certification as the "infrequent harsh case").[5]

---

**5.** In *Curtiss–Wright,* the Supreme Court expressly disapproved of the use of the phrase

To aid trial courts in determining when certification is proper, the Third Circuit has identified five nonexclusive factors to consider:

(1) the relationship between the adjudicated and unadjudicated claims;

(2) the possibility that the need for review might or might not be mooted by future developments in the district court;

(3) the possibility that the reviewing court might be obliged to consider the same issue a second time;

(4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final;

(5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

*Allis–Chalmers Corp. v. Philadelphia Elec. Co.*, 521 F.2d 360, 364 (3d Cir.1975)(footnotes omitted). In their brief, the defendants argue that *Curtiss–Wright* disqualified the fourth factor (the presence or absence of a counterclaim which could result in a set-off) from consideration (Adv.Doc. # 96, p. 8). In coming to this conclusion, the defendants apparently misunderstand the holding of *Curtiss–Wright* and also ignore binding Third Circuit precedent.

The Supreme Court's concerns in *Curtiss–Wright* arose out of the appellate court's attempt to interfere with the trial court's determination. It was a critique of a rule that absolutely forbade certification in the face of a possible set-off absent

harsh or unusual circumstances. *Id.* at 9, 100 S.Ct. 1460. Such a rule, according to the Supreme Court, would inappropriately interfere with the trial court's discretion. *Id.* This in no way reflected a view that non-frivolous counterclaims, that could be the basis of a set-off, were irrelevant or unimportant. To the contrary, *Curtiss–Wright* stated that "[t]his possibility was *surely not an insignificant factor*, especially since the counterclaims had survived a motion to dismiss for failure to state a claim." *Curtiss–Wright*, 446 U.S. at 12, 100 S.Ct. 1460 (emphasis added).

Cases following *Curtiss–Wright* make this point even more clear. At least four Third Circuit decisions (post-*Curtiss-Wright*) have stated that the presence or absence of a claim or counterclaim which could result in set-off is a relevant factor. *See, e.g., In re Diet Drugs Prods. Liab. Litig.*, 401 F.3d 143, 164 (3d Cir.2005) (concurring opinion); *Myers v. Medical Ctr. of Del.*, 28 Fed.Appx. 163, 166 (3d Cir.2002); *Berckeley Inv. Group, Ltd. v. Colkitt*, 259 F.3d 135, 144–45 (3d Cir.2001); *Waldorf v. Shuta*, 142 F.3d 601, 609 (3d Cir.1998).

As far as this Court is aware, no Third Circuit Court of Appeals case has ever articulated the factors as the defendants have identified them (stating all of the factors, except the factor that the defendants ignore). Thus, the Court will consider all five factors, including the possibility of an offsetting claim.

■■■ Weighing all of the *Allis–Chalmers* factors, the Court declines to grant certification under Rule 54(b). Neither the interests of judicial administration nor

"infrequent harsh case" as a *standard. Curtiss–Wright*, 446 U.S. at 10, 100 S.Ct. 1460. Despite this, courts have continued to use it descriptively. *See G–I Holdings, Inc. v. Bennet (In re G–I Holdings, Inc.)*, No. 02–3626, 2005 U.S. Dist. LEXIS 31862, at *18 n. 3 (D.N.J. Dec. 9, 2005)(explaining the contin-

ued use of the "infrequent harsh case" language); *see, e.g. Murphy v. Sec. Inv. Protection Corp.*, 2005 WL 2649310, at *4–5 n. 4, 2005 U.S. Dist. LEXIS 23769, at *13 n. 4 (E.D.Pa. Oct. 14, 2005)("That term is used here simply as a description of the type of case that warrants a Rule 54(b) determination.").

the equities weigh in favor of granting the request. In short, the defendants have not met their burden as the party seeking certification. *Anthuis,* 971 F.2d at 1003–04; *Allis–Chalmers Corp. v. Philadelphia Elec. Co.,* 521 F.2d 360, 365 (3d Cir.1975); *see Murphy,* 2005 WL 2649310, at *4–5, 2005 U.S. Dist. LEXIS 23769, at *12–15(determining that a bankruptcy court abused its discretion by granting a certification where the *Allis–Chalmers* factors were essentially neutral).

Although the defendants' counterclaim is separable from AZ's claims, both arise out of the same transaction. It makes sense that the claims be resolved together. The defendants have provided no indication that this would prejudice them. Unconvincingly, the defendants suggest that solvency considerations may weigh in their favor. But the defendants do not offer any credible support for this, and they admit that they "are not privy to AZ's financial status." (Adv.Doc. # 96, p. 10).

In this Court's view, the matter should proceed to trial since discovery has been completed. As already observed, AZ obviously has indemnification rights and if, and when, it can prove that it spent specified sums for environmental remediation and those sums were incurred in remediating pre-closing environmental problems, then AZ will be entitled to a judgment. Based on the equities, AZ should have the opportunity to prove what it properly spent, if anything, before an entry of a final judgment is entered.

Though this decision is necessarily based on the specific facts before this Court, the result is in accord with several analogous decisions rendered within this circuit. *See, e.g., Kurz–Kasch,* 2006 WL 561918, at *3, 2006 U.S. Dist. LEXIS 8834, at *9 (granting partial summary judgment, despite the possibility of offset, but denying Rule 54(b) certification); *Edelen,* 1993 WL 4177, at *3, 1993 U.S. Dist. LEXIS 115, at *9 (same).

Therefore, the grant of partial summary judgment will not be entered as a final judgment under Rule 54(b).

## CONCLUSION

For the foregoing reasons, the Court will deny the plaintiff's motion for summary judgment, but will grant the defendants' motion for summary judgment on its counterclaim. That grant of partial summary judgment, however, will not be entered as final under Rule 54(b).

## ORDER

For the reasons set forth in the Court's memorandum opinion of this date, the plaintiff's motion (Doc. # 92) for partial summary judgment is DENIED and the defendants' motion (Doc. # 95) for partial summary judgment on its counterclaim is GRANTED, however, the grant of partial summary judgment will not be entered as final under Rule 54(b).